# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARGARET E. BOYD,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00025 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **LINDA S. McMAHON,** | ) | |
| **Acting Commissioner of** | ) | By:   PAMELA MEADE SARGENT |
| **Social Security,**[1] | ) | United States Magistrate Judge |
| Defendant | | |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Margaret E. Boyd, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties

---

[1]Linda S. McMahon became the Acting Commissioner of Social Security on January 20, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Boyd protectively filed her current application for SSI on or about February 6, 2004, alleging disability as of December 1, 1999, based on problems with both ankles, the right knee, both hands, her muscles and a bulging disc in her back. (Record, ("R."), at 99-102, 106, 145.) Boyd's claim was denied both initially and on reconsideration. (R. at 86-88, 91, 92-94.) Boyd then requested a hearing before an administrative law judge, ("ALJ"). (R. at 95.) The ALJ held a hearing on August 11, 2005, at which Boyd was represented by counsel. (R. at 35-62.)

By decision dated November 14, 2005, the ALJ denied Boyd's claim.[2] (R. at

---

[2]Boyd filed prior applications for SSI on June 23, 1999, and October 10, 2000. (R. at 17.) However, because these applications, which were consolidated, were denied by decision dated October 24, 2003, and were not pursued further, that prior decision is *res judicata*. (R. at 17.) Thus, the relevant question before this court is whether Boyd was disabled at any time

Case 2:06-cv-00025-PMS   Document 18   Filed 02/14/07   Page 2 of 26   Pageid#: 115

17-29.)  The ALJ found that Boyd had not engaged in substantial gainful activity since December 1, 1999. (R. at 28.)  The ALJ found that the medical evidence established that Boyd had severe impairments, namely mild generalized neuropathy and carpal tunnel syndrome on the left, some problems in the knees and ankles, recent diskectomy, mild generalized dysthymic disorder and mild generalized anxiety disorder, but he found that Boyd did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28-29.)  The ALJ further found that Boyd's allegations regarding her limitations were not totally credible. (R. at 29.)  The ALJ found that Boyd had the residual functional capacity to perform light work[3] reduced by a limited ability to push and/or pull with the upper extremities. (R. at 29, 250.)  The ALJ found that Boyd had past relevant work experience as a motel maid and a restaurant worker.[4] (R. at 18.)  Based on Boyd's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Boyd could perform jobs existing in significant numbers in the national economy, including those of a cashier, a miscellaneous food preparation worker, an administrative assistant, a nonconstruction laborer, a nonpostal mail clerk, a parking lot attendant and a

---

between October 25, 2003, the day following the previous denial, and November 14, 2005, the date of the current ALJ's denial.  I note that any medical evidence included in this Memorandum Opinion not directly relevant to this time period is included for clarity of the record only.

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. § 416.967(b) (2006).

[4]In the Findings section of the ALJ's decision, he stated that Boyd had no past relevant work experience.  (R. at 29.)  However, this appears to be a typographical error since the ALJ specifically stated in the body of his decision that Boyd had past relevant work experience as a motel maid and a restaurant worker, a finding supported by the evidence of record.  (R. at 18, 107.)

-3-

greeter/hostess. (R. at 28-29.) Therefore, the ALJ found that Boyd was not under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 29.) *See* 20 C.F.R. § 416.920(g) (2006).

After the ALJ issued his opinion, Boyd pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 9-12.) Boyd then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2006). The case is before this court on Boyd's motion for summary judgment filed August 8, 2006, and the Commissioner's motion for summary judgment filed October 10, 2006.

## II. Facts

Boyd was born in 1965, (R. at 99), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She obtained her general equivalency development, ("GED"), diploma,[5] and she has past relevant work experience as a motel maid and a cook. (R. at 107, 112.)

Boyd testified at her hearing that she underwent surgery on both ankles in 1986, but that her ankle problems had continued to worsen. (R. at 42-43.) She stated that she experienced pain in her ankles on a daily basis. (R. at 43.) She further stated that she had undergone surgery on her right knee in 2001 or 2002, but had continued to have problems with both knees. (R. at 43-44.) She stated that she had not received

_____

[5]Although Boyd indicated on her Disability Report that she obtained her GED, she testified at her hearing that she graduated from high school. (R. at 42, 112.)

-4-

treatment for her knee in approximately one year. (R. at 44.) Boyd testified that standing affected both her ankles and her knees. (R. at 44.) She further testified that sitting made her ankles and knees go numb and tingle, requiring her to move around or prop her feet. (R. at 44-45.) Boyd testified that she began having difficulty with carpal tunnel syndrome in both hands in approximately 1996, for which she had undergone three release surgeries, two on the left hand and one on the right. (R. at 45.) She stated that she had difficulty gripping objects and opening jars. (R. at 46.) Boyd testified that she experienced low back pain that radiated into her legs, which was aggravated by sitting, and she noted that she had to change positions frequently throughout the day. (R. at 46-48.) Boyd estimated that she could not stand for very long in one spot. (R. at 47.) She further testified that she had to lie down part of the day on most days, and she stated that she had difficulty driving because she could not sit still for long periods. (R. at 50-51.) Boyd testified that she had recently experienced neck pain from a bulging disc with tears. (R. at 53.)

Boyd also testified that she experienced depression and anxiety, for which she took Zoloft. (R. at 48.) She stated that the Zoloft helped sometimes depending on the severity of her physical pain. (R. at 49.) Boyd testified that her mental impairments resulted in difficulty focusing on tasks. (R. at 49.)

Cathy Sanders, a vocational expert, also was present and testified at Boyd's hearing. (R. at 54-61.) Sanders classified Boyd's past work as a motel maid as medium[6] and unskilled and as a restaurant worker as light and unskilled. (R. at 55.)

---

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2006).

Sanders was asked to consider a hypothetical individual of Boyd's age, education and work history who had the exertional limitations as set forth in the physical assessment completed by Dr. Richard M. Surrusco, M.D., a state agency physician, on March 30, 2004. (R. at 55, 249-56.) Sanders testified that such an individual could perform the jobs of a cashier, miscellaneous food preparation jobs, an administrative assistant, a counter clerk, a nonconstruction laborer, a nonpostal mail clerk, a parking lot attendant, a theater clerk, a ticket clerk and a greeter/host. (R. at 56.) Sanders was next asked to consider the same hypothetical individual, but who had the exertional limitations set forth in a physical assessment completed by Lisa Fleming, a family nurse practitioner, on October 3, 2003. (R. at 56, 467-69.) Sanders testified that such an individual could perform only less than sedentary[7] jobs and, when considering the mental assessment also completed by Fleming on October 3, 2003, such an individual could perform no jobs. (R. at 56-57, 464-66.) Additionally, Sanders was asked to consider the same hypothetical individual who could perform less than the full range of light work, but who also had the nonexertional limitations set forth in a mental assessment completed by William E. Stanley, Ed.D., a licensed psychological examiner, and Donald G. Hiers, Ph.D., a licensed psychologist, in February 2005. (R. at 57, 488-90.) Sanders testified that the jobs previously mentioned would be reduced by only 15 to 20 percent, eliminating only the jobs with more strict requirements for satisfactory judgment, stress, attention, concentration, complexity, emotional stability and predictability. (R. at 57.) Sanders further testified that a hypothetical individual who could perform less than the full range of light work, but who had the nonexertional limitations set forth in a mental assessment completed by Dr. Mina D.

---

[7]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 416.967(a) (2006).

-6-

Patel, M.D., a psychiatrist, on March 2, 2005, as well as an individual who had the limitations as testified to by Boyd, would be able to perform no jobs. (R. at 58, 516-18.)

Boyd's attorney asked Sanders to consider the individual posed in the first hypothetical, but who also had often experienced deficiencies in maintaining attention and concentration resulting in difficulty completing tasks in a timely manner. (R. at 59.) Sanders testified that such limitations could eliminate a significant number of jobs previously mentioned. (R. at 59.) Sanders further testified that if the same individual also required a sit/stand option approximately every 20 minutes, her ability to perform the jobs listed would be affected. (R. at 59.) Sanders also testified that an individual who had to lie down for part of up to one hour out of the workday would not be able to perform any work. (R. at 59.) Furthermore, Sanders testified that the jobs previously mentioned could be eliminated by half to two-thirds for an individual who had difficulty repetitively using the arms and hands. (R. at 59.) Finally, Sanders testified that if an individual also had a Global Assessment of Functioning, ("GAF"), score of 50[8] for up to a year, then the number of jobs the individual could perform would further be reduced or eliminated. (R. at 60-61.)

In rendering his decision, the ALJ reviewed records from Richlands OBGYN Associates; Buchanan Rural Family Practice Center; Dr. Michael W. Bible, M.D.; Dr.

_____

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

Mina D. Patel, M.D.; Stone Mountain Health Services; Buchanan General Hospital; R. J. Milan Jr., Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Virginia Public Schools; Humana Hospital Clinch Valley; Clinch Valley Medical Center; Dr. Antonio Caday, M.D.; Robert S. Spangler, Ed.D, a licensed psychologist; Dr. G. V. Reddy, M.D.; Dr. Ramesh Kabaria, M.D.; Norton Community Hospital; Dr. Danny A. Mullins, M.D.; Dorothy Holian, Psy.D., a licensed psychologist; Washington Square Clinic; Dr. Mrugendra R. Patel, M.D.; Lisa Fleming, F.N.P.; Buchanan Orthopedics; Dominion Health & Fitness; William E. Stanley, M.Ed., a licensed psychological examiner; Family Foot & Ankle Clinic; Blue Ridge Neuroscience Center; and Wellmont Holston Valley Medical Center.

The record reveals that Boyd underwent reconstructive bilateral ankle surgery in March 1986. (R. at 276-90.) The record further reveals that Boyd underwent a release of the median nerve of the right hand due to carpal tunnel syndrome on March 8, 1993, and a release of the left hand in April 1993. (R. at 291-94.) Boyd underwent a revision of the release of the left median nerve on February 1, 2001, by Dr. Danny A. Mullins, M.D. (R. at 409.)

On March 5, 2002, Dr. Mullins performed arthroscopic surgery on Boyd's right knee. (R. at 405-06.) In August 2002, Dr. Mullins noted that Boyd had a full range of motion of the right knee with no effusions. (R. at 410-11.) X-rays of both ankles, taken on March 12, 2003, and again on May 12, 2003, were normal. (R. at 434.) X-rays of the left knee showed no bony or joint pathology. (R. at 434.)

-8-

Boyd saw Dr. Mrugendra R. Patel, M.D., from February 1999 to August 2003. (R. at 435-60.) On August 21, 2003, Boyd complained of dull headaches associated with nausea, photophobia and dizziness. (R. at 436.) She also complained of intermittent pain, tingling and numbness in both upper extremities. (R. at 436.) Boyd further complained of generalized aches and pains all over her body with occasional pain and tingling sensations in her feet. (R. at 436.) Boyd complained of polyarthralgia with arthritic pain in various joints including her lower back. (R. at 436.) Boyd reported nervousness and depression. (R. at 436.) Physical examination revealed normal muscle tone and strength in all four extremities. (R. at 436.) No sensory deficit was noted, and deep tendon reflexes were 2+ bilaterally and symmetrical. (R. at 436.) Boyd's coordination and gait were normal. (R. at 436.) Dr. Patel diagnosed Boyd with chronic pain and paresthesias in both upper extremities secondary to mild carpal tunnel syndrome and generalized neuropathy, chronic polyarthralgia/fibromyalgia syndrome, chronic migraine/tension headaches and chronic anxiety-depressive disorder. (R. at 436.) Dr. Patel prescribed a right wrist splint to be worn at night and during activity. (R. at 436.) Boyd was advised to take ibuprofen as needed. (R. at 436.) Boyd was referred to Dr. Mina Patel, M.D., a psychiatrist, and was given samples of Paxil. (R. at 435-36.)

Boyd was seen at Buchanan Rural Family Practice Center from March 2003 to June 2004. (R. at 174-204.) Over this time period, Boyd complained of right knee pain, ankle pain, back pain, depression and anxiety, among other things. (R. at 174-204.) In April 2003, an x-ray of the lumbar spine was normal, as was a bone scan, performed in May 2003. (R. at 203-04.) She was diagnosed with right knee pain, ankle pain, a herniated nucleus pulposus, ("HNP"), degenerative disc disease of the

lumbar spine, osteoarthritis, an anxiety disorder and depression. (R. at 174-204.) Boyd was treated conservatively with medications, including Robaxin, Motrin, Lortab, Paxil and Wellbutrin. (R. at 174-204.) On March 25, 2004, testing revealed a borderline antinuclear antibody, ("ANA"), screen. (R. at 174.) In March 2004, an MRI of the lumbar spine revealed degenerative changes with a left foraminal disc protrusion at the L3-L4 level of the spine. (R. at 202.) An MRI of the right knee showed a possible tear of the medial meniscus and a small amount of fluid in the suprapatellar bursa. (R. at 199-200.)

Boyd saw Dr. Mina Patel, M.D., a psychiatrist, from August 2003 to June 2004. (R. at 206-12.) On August 28, 2003, Boyd reported that she had never seen a psychiatrist before. (R. at 210.) Dr. Patel noted that Boyd was alert and fully oriented, but further noted that Boyd appeared somewhat depressed. (R. at 211.) Dr. Patel noted no evidence of psychosis, and Boyd's judgment was deemed intact. (R. at 211.) Dr. Patel diagnosed an adjustment reaction with mixed emotional features and increased Boyd's dosage of Paxil. (R. at 211.) On September 29, 2003, Boyd reported that the increased dosage helped. (R. at 212.) On October 27, 2003, Boyd reported that her depression was better with medication, and again, on December 8, 2003, Boyd stated that she was doing "much better" with Paxil. (R. at 208.) On June 28, 2004, Boyd reported that she wanted to continue taking Paxil because it helped her depression. (R. at 206.)

Boyd was seen at Stone Mountain Health Services from November 2003 to February 2004. (R. at 213-41.) On November 7, 2003, Boyd complained of right flank pain radiating into the groin area. (R. at 221.) An x-ray revealed a possible

-10-

ureteric stone. (R. at 222.) Boyd was diagnosed with right flank pain, bilateral knee pain, ankle pain and hematuria with a possible right ureteric stone. (R. at 222.) She was prescribed Cipro. (R. at 222.) On January 19, 2004, Boyd estimated her knee pain as a six out of 10 on a 10-point scale, with 10 being the worst pain. (R. at 216.) However, an examination of the knees was unremarkable. (R. at 216.) She was diagnosed with bilateral knee pain and an abnormal shadow on abdominal x-ray. (R. at 216.) She was prescribed Celebrex, Skelaxin and Ultram. (R. at 217.) An ultrasound of the upper abdomen, performed on January 21, 2004, revealed a small calcification. (R. at 239-41.) On February 10, 2004, Boyd continued to complain of bilateral knee pain. (R. at 213.) Physical examination revealed a steady gait and no ankle edema. (R. at 213.) Boyd wad diagnosed with chronic bilateral knee pain. (R. at 214.)

On March 30, 2004, R. J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Boyd suffered from an organic mental disorder, based on a full-scale IQ score of 75, and an affective disorder, based on her adjustment disorder diagnosis. (R. at 257-72.) Milan opined that a residual functional capacity assessment was necessary. (R. at 257.) He concluded that Boyd was only mildly restricted in her activities of daily living, had mild difficulties in maintaining social functioning and in maintaining concentration, persistence and pace and had experienced no episodes of decompensation. (R. at 267.) Milan's findings were affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on August 20, 2004. (R. at 257.)

The same day, Dr. Richard M. Surrusco, M.D., a state agency physician,

completed a physical assessment, indicating that Boyd could perform light work with a diminished ability to push and/or pull with the upper extremities. (R. at 250.) Dr. Surrusco imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 252-54.) These findings were affirmed by Dr. Randall Hays, M.D., another state agency physician, on August 20, 2004. (R. at 256.)

Boyd saw Dr. T. M. Kramer, D.O., at Buchanan Orthopedics, on May 27, 2004, with complaints of right knee pain. (R. at 471-72.) A physical examination revealed no evidence of inflammation, swelling or ecchymotic changes of the knees. (R. at 472.) Distal pulses were within normal limits, and sensation and deep tendon reflexes of the lower extremities were intact. (R. at 472.) Examination of both knees revealed decreased tibial rotation on the right, but no evidence of effusion was noted. (R. at 472.) Although a review of an MRI did not show any significant degenerative changes, Dr. Kramer noted a possible tear of the medial meniscus. (R. at 472.) However, Dr. Kramer further noted that this did not correspond with the physical findings obtained. (R. at 472.) Some chondromalacia of the patellofemoral joint was noted. (R. at 472.) Dr. Kramer recommended that Boyd perform strengthening exercises. (R. at 472.) On July 20, 2004, Boyd continued to complain of right knee pain and weakness, especially with increased physical activity, and bilateral ankle pain. (R. at 470.) She was again encouraged to perform extension exercises. (R. at 470.)

On July 12, 2004, Boyd presented to the emergency room at Buchanan General Hospital with complaints of right ankle pain. (R. at 242-45.) No swelling, discoloration or deformity was noted, and an x-ray revealed no evidence to suggest

-12-

acute traumatic bony changes of the right ankle. (R. at 244-45.) Boyd was advised to take ibuprofen, elevate her ankle, use an Ace bandage and decrease weight-bearing as needed. (R. at 244.) Boyd refused a pain shot or pain pill while in the emergency room. (R. at 244.)

Boyd was referred to Dr. Andrew J. Chapman, D.P.M., for an evaluation of her right ankle pain on July 14, 2004. (R. at 508-10.) A physical examination of the lower extremity demonstrated that the neurovascular status was grossly intact. (R. at 508.) Chapman noted a normal, pain-free range of motion at all joints with increased inversion noted at the subtalar joint bilaterally. (R. at 508.) He noted palpable tenderness of the right ankle with a small subcutaneous cyst at the dorsal lateral aspect of the right midfoot. (R. at 508.) No significant erythema, edema or calor was noted throughout the lower extremities. (R. at 508.) Weight-bearing x-rays of the right foot showed mild hypertrophy of the styloid process of the fifth right metatarsal suggestive of tendonitis. (R. at 508.) Boyd received a corticosteroid and local injection followed by a pronatory wrap to the right ankle. (R. at 509.)

Boyd again saw Dr. Mina Patel on July 21, 2004, with complaints of depression, crying spells and difficulty sleeping. (R. at 515.) Dr. Patel noted that Boyd seemed more depressed, and she noted that Boyd was unable to tolerate Paxil. (R. at 515.) She was given a trial of Zoloft. (R. at 515.) On September 16, 2004, Boyd reported that she was doing "some better," noting that Zoloft made her more focused, calmer and helped her sleep better. (R. at 513.) On November 10, 2004, Boyd again reported that Zoloft "helped her a lot." (R. at 512.)

-13-

Boyd was seen at Dominion Health & Fitness from October 2004 through November 2004 for thoracic and lumbar spine strengthening. (R. at 473-81.) On October 12, 2004, a physical examination revealed increased tightness in the paraspinal muscles and increased piriformis tightness. (R. at 480.) Straight leg raising was positive for pain at 90 degrees. (R. at 480.) Boyd exhibited a decreased range of motion of the trunk, hips, knees and back, as well as increased tenderness over the SI join. (R. at 480.) Boyd's sensation was intact. (R. at 480.) No medical restrictions were placed on Boyd. (R. at 480.) On October 14, 2004, Boyd reported back soreness after walking a mile the previous day. (R. at 478.) She also complained of pain in the left gluteal region. (R. at 478.) On October 21, 2004, Boyd complained of pain on the left side of the lower back. (R. at 477.) On October 28, 2004, Boyd continued to complain of back pain. (R. at 476.) On November 3, 2004, Boyd complained of tingling versus pain in the back. (R. at 475.) She stated that she could not move her left leg. (R. at 475.) Boyd was discharged from physical therapy on November 9, 2004, at which time it was noted that she had been compliant with therapy and had improved her range of motion and strength. (R. at 473-74.)

Boyd again saw Dr. Mrugendra Patel on December 13, 2004, for a nerve conduction study of the left lower extremity. (R. at 519-21.) This study showed no electrodiagnostic evidence of generalized neuropathy or left lumbosacral radiculopathy. (R. at 519.) An ANA test, performed on January 31, 2005, was negative. (R. at 526.)

Donald Hiers, Ph.D., a licensed psychologist, and William E. Stanley, M.Ed., a licensed senior psychological examiner, performed a psychological evaluation of

-14-

Boyd on February 12, 2005. (R. at 482-87.) It was noted that Boyd presented as socially confident and comfortable. (R. at 482-83.) She generally understood the instructions given to her readily. (R. at 483.) Boyd demonstrated erratic or variable concentration, but she was appropriately persistent on assessment tasks. (R. at 483.) Hiers and Stanley noted that Boyd was alert and fully oriented. (R. at 484.) They opined that Boyd was of borderline to low average intelligence and was emotionally depressed and anxious. (R. at 484.) Her social skills were deemed adequate, but the examiners noted a somewhat flattened affect. (R. at 485.)

The Miller Forensic Assessment of Symptoms Task, ("M-FAST"), test was administered, which suggested that Boyd was exaggerating her psychiatric symptoms. (R. at 485.) The Personality Assessment Inventory, ("PAI"), also was administered, which also indicated that Boyd was attempting to present herself in a negative light. (R. at 485.) The examiners concluded that while some psychiatric illness was present, it was not of the severity of which Boyd tried to portray. (R. at 485.) Boyd was diagnosed with post-traumatic stress disorder, ("PTSD"), mild to moderate, major depressive disorder, recurrent, with psychotic features, mild to moderate, generalized anxiety disorder, mild to moderate, borderline to low average intellectual functioning and a then-current GAF score of 50. (R. at 486.) Hiers and Stanley concluded that Boyd had a mild to moderate degree of mental illness, and they recommended that she become involved in a comprehensive psychological treatment program to include therapy and counseling and medications. (R. at 487.)

Hiers and Stanley also completed a mental assessment, indicating that Boyd had a good ability to follow work rules, to relate to co-workers, to deal with the public, to

-15-

interact with supervisors, to function independently, to understand, remember and carry out detailed and simple instructions, to maintain personal appearance and to demonstrate reliability. (R. at 488-90.) They found that Boyd had a fair ability to use judgment, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 488-89.)

On March 3, 2005, Dr. Mina Patel completed a mental assessment, indicating that Boyd had an unlimited or very good ability to understand, remember and carry out simple job instructions and to maintain personal appearance and a good ability to follow work rules and to understand, remember and carry out detailed job instructions. (R. at 516-18.) In all other areas of adjustment, Boyd was deemed to have fair abilities. (R. at 516-17.) Dr. Patel opined that Boyd could manage benefits in her own best interest. (R. at 518.)

An MRI of the cervical spine, performed on March 14, 2005, showed a mild bulge of the annulus at the C5-C6 level. (R. at 531.) An MRI of the lumber spine, performed on March 29, 2005, showed a small disc protrusion at the L3-L4 and L4-L5 levels of the spine. (R. at 532.)

On August 2, 2005, Boyd saw Dr. Paul C. Peterson, M.D., a neurologist with Blue Ridge Neuroscience Center, for an evaluation of her back pain, left leg numbness and left leg pain. (R. at 534-37.) Boyd denied any lability of mood, hallucinations, grandiose ideas, disturbance in sleep, major depression or significant psychiatric

-16-

dysfunction.  (R. at 535.)  No edema of the lower extremities was noted, but Boyd's gait was antalgic to the left.  (R. at 535.)  A physical examination revealed tenderness of the lumbar spine, and straight leg raise testing was positive at 20 degrees on the left.  (R. at 535-36.)  She exhibited 4+ strength of the left leg, her sensation was intact and deep tendon reflexes were normal.  (R. at 536.)  Boyd was diagnosed with a lumbar HNP of the left foraminal L3-L4, leg pain with an element of L3 radiculopathy, low back pain and numbness of the left leg.  (R. at 536.)  Conservative treatment was recommended.  (R. at 536.)  Boyd was prescribed Lortab and was advised that she could perform the work activities of a housekeeper.  (R. at 536.)

Boyd again saw Dr. Peterson on August 23, 2005, for a follow-up evaluation. (R. at 538-41.)  At that time, Dr. Peterson recommended back surgery.  (R. at 538.) Boyd again denied any lability of mood or significant depression.  (R. at 539.)  Her gait was antalgic to the left, and straight leg raise testing was positive at 20 degrees on the left.  (R. at 539-40.)  Strength of the left lower extremity was 4+, and Boyd's sensation was intact.  (R. at 540.)  Dr. Peterson noted that Boyd was alert and oriented and her mood and affect were age- and situation-appropriate.  (R. at 540.)  An MRI of the lumbar spine showed a neural foraminal disc protrusion on the left at the L3-L4 level with compression upon the left L3 nerve root and osteoarthritis of the facet joints at the L4-L5 and L5-S1 levels bilaterally.  (R. at 543-44.)  Boyd's diagnoses remained unchanged.  (R. at 540.)  She was scheduled to undergo a left hemilaminectomy and lateral diskectomy at the L3-L4 level of the spine.  (R. at 541.)  This surgery was performed on August 26, 2005, and it was noted that Boyd tolerated the procedure well.  (R. at 545.)

-17-

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

By decision dated November 14, 2005, the ALJ denied Boyd's claim. (R. at 17-29.) The ALJ found that the medical evidence established that Boyd had severe impairments, namely mild generalized neuropathy and carpal tunnel syndrome on the

left, some problems in the knees and ankles, recent diskectomy, mild generalized dysthymic disorder and mild generalized anxiety disorder, but he found that Boyd did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28-29.) The ALJ found that Boyd had the residual functional capacity to perform light work reduced by a limited ability to push and/or pull with the upper extremities. (R. at 29, 250.) Based on Boyd's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Boyd could perform jobs existing in significant numbers in the national economy. (R. at 28-29.) Therefore, the ALJ found that Boyd was not under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 29.) *See* 20 C.F.R. § 416.920(g) (2006).

In her brief, Boyd argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 11-19.) Boyd also argues that the ALJ erred by substituting his views on the severity of her psychiatric impairments for those of trained professionals. (Plaintiff's Brief at 20-23.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently

explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the evidence, I find that substantial evidence exists in this record to support the ALJ's finding that Boyd retained the residual physical functional capacity to perform light work, diminished by a limited ability to push and/or pull with the upper extremities. I first note that objective testing and physical examinations conducted by several medical sources reveal only mild symptoms. The record reveals that after Boyd underwent surgeries for ankle, knee and arm problems related to carpal tunnel syndrome, her conditions improved. In April 2003, an x-ray of the lumbar spine showed no demonstrable pathology, as did a bone scan the following month. (R. at 203-04.) Boyd was treated conservatively with medications. (R. at 175-95, 217, 222.) In January 2004, a physical examination of Boyd's knees was unremarkable. (R. at 216.) The following month, a physical examination revealed a steady gait and no ankle edema. (R. at 213.) In March and April 2004, an MRI of the lumbar spine revealed degenerative changes with a left foraminal disc

Case 2:06-cv-00025-PMS   Document 18   Filed 02/14/07   Page 20 of 26   Pageid#: 133

protrusion at the L3-L4 level of the spine, and an MRI of the right knee showed a possible tear of the medical meniscus, as well as some fluid in the suprapatellar bursa, but Boyd again was treated conservatively. (R. at 199-200, 202.) An x-ray of the right ankle yielded normal results. (R. at 245.) In May 2004, Dr. Kramer noted no evidence of inflammation, swelling or ecchymotic changes of the knees, distal pulses were within normal limits and sensation and deep tendon reflexes of the lower extremities were intact. (R. at 472.) An examination of the knees revealed decreased tibial rotation on the right. (R. at 472.) After reviewing the MRI showing a possible tear of the medial meniscus, Dr. Kramer noted that this was not corroborated by objective physical findings. (R. at 472.) Strengthening exercises were recommended. (R. at 472.) In July 2004, the neurovascular status of Boyd's lower extremities was intact, and she exhibited a pain-free range of motion at all joints. (R. at 508.) Palpable tenderness of the right ankle was noted, but no significant erythema, edema or calor was noted throughout the lower extremities. (R. at 508.) Weight-bearing x-rays of the right foot showed only mild hypertrophy suggestive of chronic tendonitis. (R. at 508.) At an emergency room visit on July 12, 2004, Boyd refused a pain shot or pain pill for ankle pain. (R. at 244.) Upon discharge from physical therapy in November 2004, it was noted that Boyd had improved her range of motion and strength. (R. at 473.) The following month, a nerve conduction study of the left leg showed no evidence of generalized neuropathy or left lumbosacral radiculopathy. (R. at 519.) In March 2005, an MRI of the cervical spine showed a mild bulge of the annulus at the C5-C6 level, and an MRI of the lumbar spine showed a small disc protrusion at the L3-L4 and L4-L5 levels of the spine. (R. at 531-32.) In August 2005, no edema of the lower extremities was noted, Boyd exhibited 4+ strength of the left leg, her sensation was intact and deep tendon reflexes were normal. (R. at 535-

-21-

36.) Straight leg raising was positive at 20 degrees on the left and she exhibited tenderness of the lumbar spine. (R. at 535-36.) Dr. Peterson diagnosed a lumbar HNP, leg pain with an element of L3 radiculopathy, low back pain and numbness of the left leg. (R. at 536.) Later that month, Boyd underwent back surgery. (R. at 545.) There are no medical records contained in the file following Boyd's back surgery. Thus, there was no evidence before the ALJ or this court to demonstrate that Boyd's back condition is likely to last at least 12 continuous months as required by the regulations. *See* 20 C.F.R. § 416.909 (2006).

In addition to these treatment notes and objective findings, I further note that the state agency physician found that Boyd could perform light work with a diminished ability to push and/or pull with the upper extremities. (R. at 250.) Such findings are corroborated by Boyd's own statements regarding her activities. For instance, in a Daily Activities Questionnaire, dated March 14, 2004, Boyd reported getting her children ready for school, performing housework, including sweeping, dusting and doing laundry, helping her children with homework and getting them ready for bed, pulling weeds from her flower bed, taking her children to and picking them up from sporting events, cooking with assistance, grocery shopping with assistance and watching her children participate in sporting events. (R. at 135-44.)

Based on my review of the evidence, I also find that substantial evidence exists in this record to support the ALJ's finding regarding Boyd's mental residual functional capacity. The ALJ adopted the mental assessment completed by psychologists Hiers and Stanley. (R. at 488-90.) Boyd argues that the ALJ erred by rejecting the findings of Robert S. Spangler, Ph.D., a licensed psychologist. For the

following reasons, I find that substantial evidence supports the ALJ's findings with regard to Boyd's mental residual functional capacity.

At the outset, I note that Boyd did not allege any disabling mental impairments on her February 13, 2004, Disability Report, submitted in connection with her SSI application, or on her Appeal Disability Report, dated May 11, 2004, following the Social Security Administration's denial of her claim. (R. at 106, 145.) I further note that while Boyd's alleged onset date of disability is December 1, 1999, she sought no mental health evaluation until March 2000, when she saw psychologist Spangler at her attorney's request. (R. at 346-51.) Boyd did not see another psychologist until almost three years later, in December 2002, that time at the request of Disability Determination Services. (R. at 420-22.) Boyd finally sought mental health treatment on her own in August 2003, when she began seeing Dr. Mina Patel, who diagnosed her with an adjustment reaction with mixed emotional features. (R. at 211.) Dr. Patel completed two mental assessments of Boyd, one in 2003 and the other in 2005, placing rather harsh restrictions upon Boyd. (R. at 461-63, 516-18.) I find that the ALJ properly afforded little probative value to these assessments because the limitations contained therein simply are not supported by Dr. Patel's treatment notes, in which she placed no work-related mental limitations on Boyd. Moreover, Dr. Patel's treatment notes reveal that Boyd's condition was controlled with medication. (R. at 206, 208, 212, 512-13.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

While Boyd relies on psychologist Spangler's findings as support for her

-23-

argument, I note that Spangler's evaluation was conducted in March 2000, more than three years prior to the relevant time period currently before this court. Thus, for this reason alone, I find that it is not entitled to any weight in determining Boyd's mental residual functional capacity. Next, while Boyd points to Dr. Mrugendra Patel's findings to bolster her argument, I note that Dr. Patel is not a mental health professional, and that the treatment notes from this time period reflect mostly physical complaints by Boyd. (R. at 435-60.) Thus, it also is entitled to no weight. Boyd next relies upon the findings of Dr. Jackie Briggs, M.D., and Fleming, Dr. Briggs's nurse practitioner. Fleming completed a mental assessment in October 2003 finding that Boyd had no useful ability in four areas of adjustment and a seriously limited ability in five areas of adjustment. (R. at 464-66.) However, as the Commissioner notes in her brief, a nurse practitioner is not considered a medically acceptable source under the regulations upon which this court may rely in arriving at a disability determination. *See* 20 C.F.R. § 416.913 (2006). Moreover, this assessment is inconsistent with the treatment notes from Dr. Briggs's practice group, in which no such restrictions were placed upon Boyd. I further note that it appears that the diagnoses of an anxiety disorder and depression were based upon Boyd's subjective allegations alone. Finally, while Boyd argues that her contention that the ALJ erred in his mental residual functional capacity assessment is supported by the findings of psychologists Hiers and Stanley, I again disagree. For instance, Hiers and Stanley concluded that Boyd was exaggerating her psychiatric symptoms or trying to present herself in a negative light. (R. at 485.) They found that Boyd had good abilities in nine areas of adjustment and fair abilities in six areas of adjustment. (R. at 488-89.) In fact, these limitations are precisely the ones adopted by the ALJ, so any argument that the ALJ rejected their findings is misplaced. The only portion of Hiers's and

-24-

Stanley's findings that the ALJ specifically rejected was their diagnosis of PTSD.[9]

I find that the ALJ's mental residual functional capacity determination is further supported by the findings of state agency psychologist Milan. In March 2004, Milan concluded that Boyd was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 267.) Milan's findings were subsequently affirmed by state agency psychologist Tenison. (R. at 257.) In addition, I note that Boyd's activities of daily living, as enumerated above, further support the ALJ's mental residual functional capacity finding.

For all of these reasons, I find that the ALJ did not err in his determination that Boyd could perform light work diminished by an inability to push and/or pull with the upper extremities.

Lastly, I find Boyd's argument that the ALJ improperly substituted his views for those of trained mental health professionals to be without merit. While it is true that an ALJ may not simply disregard uncontradicted expert opinions in favor of his own opinion on a subject that he is not qualified to render, *see Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988), as noted previously, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his

---

[9]Specifically, the ALJ stated that he was rejecting this diagnosis because it was based on allegations of Boyd that she was sexually molested as a child, allegations that she had never raised before. (R. at 25.)

rationale and if the record supports his findings. That is exactly what the ALJ did here. As noted above, substantial evidence supports the ALJ's decision to reject various opinions regarding Boyd's limitations resulting from her mental impairments. However, it is clear to this court that the ALJ did not substitute his own views for those of trained mental health professionals, but properly weighed the evidence, rejecting some and accepting some, before reaching his ultimate decision. In the end, the ALJ decided to accept the limitations found by Hiers and Stanley, a decision supported by substantial evidence for all the reasons previously discussed. That being said, I find that the ALJ did not improperly substitute his views for those of trained professionals in deciding Boyd's mental residual functional capacity.

### III. Conclusion

For the foregoing reasons, Boyd's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:      This 14th day of February 2007.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE